UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

KERRY D. MILLER,

        Plaintiff,                      Case No. 1:18-cv-702

v.                                             Honorable Robert J. Jonker

BRENDA STEVENSON et al.,

        Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

Applying these standards, the Court will dismiss Plaintiff's complaint against Defendants for failure to state a claim.

## Discussion

### I. Background

Plaintiff Kerry D. Miller is a 58-year old man serving a prison sentence of 26-40 years for first-degree criminal sexual conduct (CSC I), and 15-30 years for unlawful imprisonment.

At his jury trial in 2009, the complaining witness testified that she had been friendly with Plaintiff for several years, and had occasionally taken his money in exchange for sexual favors. *People v. Miller*, No. 293404, 2010 WL 4905081, at *1 (Mich. Ct. App. Dec. 2, 2010). On the date of the offense, he offered her $75 to tie her up. She agreed. Plaintiff then duct-taped her mouth, put her in restraints, beat her buttocks with a belt several times, punched her in the mouth, and penetrated her vagina with his penis before ejaculating on her chest. He threatened to kill her if she told anyone what he had done.

Before his CSC I conviction, Plaintiff had served a sentence for third-degree criminal sexual conduct (CSC III), for which he was convicted in 1990. *Id.* at *2. The victim of the 1990 offense testified that she dated Plaintiff briefly, but when she told him that she wanted the relationship to end, he put her in handcuffs, ripped off her clothes, threatened her with a gun, beat her with a riding crop, and raped her repeatedly. *Id.* at *3.

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at Carson City Correctional Facility (DRF). The events about which he complains occurred while he was at the Muskegon Correctional Facility (MCF) and the Richard A. Handlon Correctional Facility (MTU). Plaintiff sues Psychologist Brenda Stevenson and Psychiatrist Brian Glynn, who work at MCF. He also sues Psychologist (unknown) McAuliffe, who works at MTU.

In his complaint, Plaintiff refers to himself as "Ms. Nicki Nicole Summers"; he alleges that he is a "preoperative male-to-female transsexual who displays female body features," including "developed breast [tissue]," as well as a "feminine demeanor." (Compl., ECF No. 1, PageID.11.) He contends that he has lived as a woman since the age of 17. He alleges that in 2005, following his release for the CSC III offense, but before his incarceration for the CSC I

offense in 2008, he received hormone therapy for three years so that he would develop female physical characteristics.

In January 2017, while Plaintiff was incarcerated at MCF, he sent a kite to Defendant Stevenson asking to "talk to someone ASAP." (Ex. N. to Compl., ECF No. 1-2, PageID.160.) Plaintiff alleges that he wanted to be assessed for "GID."[1] (Compl., PageID.13.) Stevenson met with Plaintiff and referred him to be evaluated for GID.

On or about February 21, 2017, Plaintiff sent another kite to Stevenson; this time, Plaintiff asked to be castrated. Plaintiff also complained that his cellmate was masturbating while standing over him at night, while fondling Plaintiff's breast. (*Id.*, PageID.14.) Apparently, Stevenson did not respond.

That same day, Defendant Glynn evaluated Plaintiff for GID. Glynn allegedly asked Plaintiff "inappropriate" questions about Plaintiff's sexual activity, and none about Plaintiff's gender identity. (*Id.*, PageID.15.) For instance, Glynn allegedly asked Plaintiff, "Do you like big penis? Do you like black or white penises? Do you put your penis in someone's anus?" (*Id.*) Plaintiff asserts that he does not "indulge in putting [his] repugnant penis anywhere." (*Id.*) Plaintiff contends that Defendant Glynn and the other defendants do not have expertise in diagnosing or treating GID.

According to Glynn's report following this evaluation, "it was not possible to establish [the] diagnosis [of GID]" at the time of the examination, because Plaintiff's GID claim "was not substantiated[.]" (Glynn Report, ECF No. 1-1, PageID.65-66.) Glynn noted that Plaintiff has "an active homosexual orientation which he would appear to accep[t] as satisfactory and

---

[1] GID stands for gender identity disorder. That condition has been removed from The Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and replaced with gender dysphoria.

appropriate."[2] (*Id.*, PageID.66.) Plaintiff's primary concern seemed to be "recognition of his sexual orientation and [to] have a PREA number and record." The "only act[i]on that might be seen as a symptom of GID" was Plaintiff's occasional desire "to be female in sexual activity. He never claimed he wanted to be in a female body." (*Id.*) Glynn recommended additional "psychological interven[tion]" and an "update in 6 months as to [Plaintiff's] claim to be GID." (*Id.*, PageID.67.)

Plaintiff was transferred to MTU before receiving the results of Glynn's evaluation, because Plaintiff's cellmate threatened to stab Plaintiff. (Compl., PageID.19.) Defendant McAuliffe met with Plaintiff at MTU on March 23, 2017. McAuliffe told Plaintiff that he did not meet the criteria for GID "at this time." (*Id.*, PageID.20.) McAuliffe allegedly told Plaintiff that "the only help that she was willing to give fags was to lock [Plaintiff] up in Protective Custody[.]" (*Id.*)

Thereafter, Plaintiff sent McAuliffe several kites, requesting to be seen, but McAuliffe did not respond. In May, Plaintiff sent a kite to McAuliffe, stating that he needed to "talk to someone real bad." (Kite, ECF No. 1-2, PageID.179.) On June 25, 2017, Plaintiff kited McAuliffe again, asking to speak with someone about Plaintiff's "[cellmate's] inappropriate behavior." (Kite, ECF No. 1-2, PageID.173.) Plaintiff did not provide any details about this behavior, however. (*See id.*) On July 6, Plaintiff wrote a kite claiming that he was having a "breakdown" and he needed some "girl talk." (Kite, ECF No. 1-2, PageID.175.) McAuliffe did not respond directly, but on July 7, Plaintiff received a kite response indicating that he should

---

[2] In documents prepared by Plaintiff in 2015, in which Plaintiff repeatedly refers to himself as "a homosexual." (Grievance, ECF No. 1-1, PageID.109-110.) Also, in his complaint, Plaintiff alleges that he "does not find females sexually att[ract]ive!" (Compl., PageID.24.)

4

"refer housing issues to the appropriate staff," and that if he had any mental health issues, he should specify them in his kite. (Kite Response, ECF No. 1-2, PageID.174.)

On July 16, Plaintiff wrote a kite to McAuliffe complaining that his "bunkie," who had since moved to another facility, harassed Plaintiff, breaking Plaintiff's glasses and touching Plaintiff inappropriately. (Kite, ECF No. 1-2, PageID.176-177.) Plaintiff also mentioned being "raped, stabbed and beaten" in the past (*id.*, PageID.177.), ostensibly referring to an incident that he reported in August 2011 (*see* Clinical Progress Note (Aug. 11, 2011), ECF No. 1-2, PageID.167). McAuliffe did not respond to this kite either. Instead, McAuliffe charged Plaintiff with sexual misconduct for sending her a letter filled with accusations against McAuliffe and sexual details about Plaintiff. (Misconduct Report, ECF No. 1-5, PageID.291.) A hearing officer found Plaintiff not guilty of the charge. (Class I Misconduct Hearing Report, ECF No. 1-5, PageID.292.)

Plaintiff claims that it was "obvious" to McAuliffe that Plaintiff was vulnerable to attacks by other inmates because Plaintiff has a feminine appearance due to his "breast development," and because Plaintiff notified McAuliffe of his cellmate's "conduct" and "sexual advances." (Compl., PageID.27.)

On September 16, Plaintiff filed a grievance asking for another evaluation for GID because six months had passed since Glynn's evaluation. On September 28, Plaintiff met with another psychiatrist and continued to assert that he is a female. The psychiatrist told Plaintiff to send a kite to healthcare to be assessed by a physician for GID.

Plaintiff met with a physician in October. The physician promised to give Plaintiff a "treatment plan," and referred Plaintiff to a psychiatrist to complete the GID assessment. (Compl., PageID.35; s*ee* MDOC Health Care Report (Oct. 16, 2017), ECF No. 1-6, PageID.340.)

A psychiatrist completed the GID assessment in November, and in April 2018, Plaintiff was given a management plan, which included a special accommodation for "relative privacy" in the showers. (Individual Management Plan for Gender Dysphoria (Apr. 25, 2018), ECF No. 1-8, PageID.456.)

Based on the foregoing, Plaintiff claims that Defendants deprived him of treatment for a serious medical need, in violation of the Eighth Amendment. He also claims that they denied him the right to equal protection under the Fourteenth Amendment by refusing to treat him with hormones. In addition, Plaintiff claims that Defendants violated his right under the First Amendment to petition the government for redress of grievances by interfering with the grievance process. Finally, Plaintiff contends that Defendants failed to comply with MDOC policy regarding the assessment/treatment of prisoners with GID.

As relief, Plaintiff seeks an injunction requiring him to receive hormone treatment, castration, access to women's undergarments, single-cell housing, and private showers. (Compl., PageID.60.) Plaintiff also seeks monetary damages of $200,000 from each Defendant.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

When evaluating Plaintiff's complaint for failure to state a claim, the Court can consider the attachments to the complaint and public records. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (when evaluating the sufficiency of a complaint under Rule 12(b)(6), a court "may consider the Complaint and any exhibits attached thereto, public records, [and] items appearing in the record of the case . . . so long as they are referred to in the Complaint and are central to the claims contained therein"); *see also Arauz v. Bell*, 307 F. App'x 923, 925 n.1 (6th Cir. 2009) (noting that an appellate court can consider attachments to a complaint when reviewing a dismissal under the PLRA).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

7

identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Eighth Amendment

Plaintiff contends that Defendants violated his rights under the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

8

Plaintiff's complaint contains allegations that might give rise to two different types of Eighth Amendment claims. He claims that Defendants did not provide treatment for his GID/gender dysphoria, which is one possible claim. He also alleges that Defendants did not respond to his concerns about his cellmate, which is another possible claim. The Court will address these claims separately.

1. Failure to provide treatment for gender dysphoria

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if a misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *accord Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v.*

10

*Hininger*, 553 F. App'x 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Here, Plaintiff claims that Defendants deprived him of treatment for GID/gender dysphoria. Gender dysphoria has been recognized as a serious medical need by some courts. *See, e.g.*, *Murray v. U.S. Bureau of Prisons*, No. 95–5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Since transsexualism is a recognized medical disorder, and transsexuals often have a serious medical need for some sort of treatment, a complete refusal by prison officials to provide a transsexual with any treatment at all would state an Eighth Amendment claim for deliberate indifference to medical needs.") (citing *Phillips v. Mich. Dep't of Corrs.*, 731 F. Supp. 792, 799 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991)). However, Plaintiff cannot satisfy the subjective component of an Eighth Amendment claim. His allegations do not indicate deliberate indifference to Plaintiff's needs.

According to Plaintiff, in January 2017, he wanted to be evaluated for GID, and Defendant Stevenson responded by referring him for an evaluation. In other words, she responded favorably to his request. Thus, she was not deliberately indifferent to his medical/mental health needs.

Defendant Glynn conducted the evaluation and concluded that a diagnosis could not be substantiated at that time. He recommended psychiatric intervention and a follow-up in six months. These actions are also not indicative of deliberate indifference. He did not refuse to provide any treatment at all. Apparently, Plaintiff would have preferred immediate surgery or hormone treatment rather than psychiatric care, but he is not constitutionally entitled to a specific kind of care for his condition. *Murray*, 1997 WL 34677, at *4.

To the extent Plaintiff disagrees with Glynn's determination that a GID diagnosis could not be substantiated at that time, Plaintiff does not state a claim. The Court will not second-guess Glynn's professional judgment. There are no facts from which to infer that the need for immediate care would have been obvious, even to a layman. The fact that Plaintiff has a feminine appearance or that he referred to himself as a woman at his evaluation does not necessarily mean that he has a persistent desire to be a woman or that he has significant discomfort with his physical features. Indeed, although Plaintiff alleges that he has been living as a woman since he was a teenager, it appears that he was incarcerated for years before he decided that he should request an evaluation for GID.[3] If Plaintiff's need for treatment really was serious, then presumably he would have requested an evaluation earlier. In other words, under the circumstances alleged, it was perfectly reasonable for Glynn to recommend a follow-up in six months to ensure that Plaintiff's desire to be treated as a woman was persistent and genuine.

In addition, to the extent Plaintiff disagrees with Glynn's *manner* of diagnosis or his knowledge about how to properly diagnose GID, Plaintiff does not state a claim. Plaintiff's allegations about Glynn's inappropriate questions may give rise to a tort claim for negligence or medical malpractice, but they do not establish deliberate indifference to Plaintiff's medical needs.

For similar reasons, Plaintiff does not state a claim against Defendant McAuliffe, who merely relayed the results of the psychiatric evaluation to Plaintiff. In short, there are no facts from which to reasonably infer that Defendants Stevenson, Glynn, or McAuliffe were deliberately

---

[3] Plaintiff contends that his claim to being female is reflected in the prison records attached to his complaint which date back to August 10, 2011 (Compl., PageID.23), but the documents to which he refers provide no support for his assertion. Moreover, Plaintiff never identified himself as a woman in other lawsuits that he has filed in this Court. *See Miller v. Westcomb*, No. 2:14-cv-45 (W.D. Mich.); *Miller v. Miller*, No. 1:10-cv-203 (W.D. Mich.); *Miller v. Borges*, No. 1:05-cv-531 (W.D. Mich.). And the facts supporting his criminal convictions discredit his claim that he is uncomfortable with his male body parts.

indifferent to Plaintiff's need for care with respect to his gender identity, or any serious mental health concern.

2.  Failure to respond to Plaintiff's concerns about his cellmate

Plaintiff also contends that he notified Defendants about various concerns with his cellmates, but they did not respond. Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish a violation of this right, Plaintiff must show that Defendant was deliberately indifferent to the Plaintiff's risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988). While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack. *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.").

It is not clear what Plaintiff expected Defendants to do in response to his complaints about his cellmate. Defendants were mental health professionals, responsible for mental health treatment. They were not housing staff, responsible for his cell conditions or his physical safety in relation to other prisoners. If Plaintiff wanted protective custody or had problems with his cellmate, he could have asked for assistance from the officers in his unit, as one of the kite responses directed.

Moreover, Plaintiff does not allege any facts indicating that Defendants were deliberately indifferent to a significant risk of physical harm. Plaintiff's complaint to Stevenson

that an inmate was masturbating near him and touching his breast does not evince a sufficiently serious risk of harm that would have required Stevenson to act, even if Stevenson had the authority to do so. Similarly, Plaintiff's vague complaint to McAuliffe that Plaintiff's cellmate was behaving "inappropriately" did not suggest that Plaintiff was at risk of physical harm. Nor did Plaintiff's kite to McAuliffe in July 2017, in which Plaintiff claimed that his *former* cellmate had been touching him "inappropriately." There was nothing for McAuliffe to do at that point to protect Plaintiff's safety because the cellmate had already been transferred to another facility, and inappropriate conduct toward Plaintiff by one inmate does not necessarily mean that Plaintiff is at risk of being harmed by other inmates.

Moreover, Plaintiff alleges no facts to support his conclusory assertion that he was "obviously" at risk of harm because of his feminine appearance, let alone that this risk was significant enough such that a failure to protect him would have been a violation of the Eighth Amendment.

For all the foregoing reasons, Plaintiff does not state an Eighth Amendment claim against Defendants.

### B. Equal Protection

Plaintiff contends that Defendants denied him his right to equal protection because they did not treat him with hormone therapy. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v.*

14

*Murgia*, 427 U.S. 307, 312 (1976). Because a fundamental right is not implicated in this case and Plaintiff does not allege that he is a member of a suspect class, he is not entitled to strict scrutiny. Instead, the decision not to provide hormone treatment need only be rationally related to a legitimate governmental interest. *See United States v. Kras*, 409 U.S. 434, 446 (1973); *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997).

To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Plaintiff's equal-protection claim is wholly conclusory. He does not allege any facts supporting his assertion that he is treated differently from similarly-situated prisoners. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678.

### C. First Amendment

Plaintiff contends that Defendants denied him his First Amendment right to petition the government for redress of grievances by interfering with the grievance process. He claims that Defendants interfered with the process by "concealing" their constitutional violations. (Compl., PageID.59.)

Plaintiff's claim is both conclusory and meritless. It is conclusory because the complaint contains no allegations pertaining to concealment. It is meritless because interference with the grievance process does not deprive a prisoner of First Amendment rights.

"A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to,

15

and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415-16 (6th Cir. 2014) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff had the ability to seek redress through the Court, which is underscored by his filing of this very case. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982).

Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1858-59 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470 (6th Cir. 2001).

Because Plaintiff has not been denied the right to petition for redress of grievances, he does not state a First Amendment claim.

### D. MDOC Policy

Plaintiff alleges that he met all the requirements for GID/gender dysphoria in the MDOC policy, but Defendants deliberately refused to recognize his condition. Defendants' alleged failure to comply with prison policy does not state a claim under § 1983, however, because it does not rise to the level of a constitutional violation. *Laney v. Farley*, 501 F.3d 577, 581 n.2

(6th Cir. 2007); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest). Section 1983 is addressed to remedying violations of federal law, not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81. Accordingly, Plaintiff does not state a claim based on Defendants' failure to follow MDOC policy.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.

Dated:   August 6, 2018            /s/ Robert J. Jonker
                                                ROBERT J. JONKER
                                                CHIEF UNITED STATES DISTRICT JUDGE